NOT DESIGNATED FOR PUBLICATION

No. 123,971

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of C.H.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Johnson District Court; KATHLEEN SLOAN, judge. Opinion filed December 10, 2021. Affirmed.

*Dennis J. Stanchik*, of Shawnee, for appellant natural father.

*Elizabeth A. Billinger*, assistant district attorney, and *Stephen M. Howe*, district attorney, for appellee.

Before GREEN, P.J., MALONE and ISHERWOOD, JJ.

PER CURIAM: The district court terminated Father's parental rights to C.H. based on an evidentiary proffer provided by the State at a termination hearing that he did not attend. Father appeals, arguing the district court's findings that he was unfit to parent C.H. and would remain unfit for the foreseeable future were not supported by clear and convincing evidence. Father also contends the court abused its discretion in concluding that termination of his parental rights was in the best interests of C.H. Because the district court's findings are reasonable and supported by the evidence, we affirm its decision.

1

On May 29, 2018, the State petitioned to have C.H. and her three half-siblings declared children in need of care (CINC). The children share the same mother, but each has a different father; the petition named K.M. (Father) as the alleged father of C.H. C.H. did not live with Father and Father's name does not appear on the child's birth certificate. While paternity of C.H. has never been established, Father was named, served process, and appeared once in court as C.H.'s father. C.H. and her siblings lived with Mother and several other individuals in Olathe. The parental rights of Mother and the other children's fathers are not involved in this appeal, but Mother has separately appealed the termination of her parental rights to all four children.

The State's petition stemmed from four reports received by the Kansas Department for Children and Families (DCF) which detailed instances of alleged physical and medical neglect and a general lack of supervision of the children. One report noted that C.H.'s eldest sibling had been left to care for the others and that the children were "allowed to run around the house naked with strange men in and out of the house" while Mother used drugs in the basement. Another report noted that Mother was allegedly suicidal and stated that she would "kill her kids first before killing herself because she did not want them to grow up without a mother." Not long after these reports surfaced, police received a called from a neighbor who found C.H. and her siblings wandering around the neighborhood alone. The neighbor took the children in and waited for Mother to notice their absence; when Mother did not do so, the neighbor called the police. Officers took the children into protective custody, noting that they smelled of urine and that C.H. appeared unwashed. Because Father lives out of state and has never served as a primary caregiver to C.H. the petition included scant information about his role as a father.

The same day the State filed its petition, the district court granted an order of emergency temporary custody, citing concerns about lack of supervision and the

children's poor physical condition. Father did not appear at the hearing. So the district court appointed an attorney for him, mailed notice to him, and set dates for a first appearance. That notice was sent to Father at Ross Correctional Institution in Ohio. Father appeared at a later court date and was served in person at that time. However, Father opted to return to Ohio, ceased all communication with DCF and KVC, did not seek to establish a case plan, and failed to submit to four scheduled home visits that DCF arranged for him in Ohio. The court continued the case in expectation of Father completing the requested genetic testing to establish his parentage. The case was also delayed because two of the other children's fathers had not been served. But Father never completed the genetic testing, did not try to contact or visit C.H. or involve himself in her case, nor did he otherwise participate in any way during the pendency of the case.

After C.H. and her siblings had been in the custody of DCF for six months, on November 21, 2018, the district court adjudicated them to be CINC under K.S.A. 2020 Supp. 38-2202(d)(1), (d)(2), (d)(3), and (d)(4). Father appeared only through his appointed counsel. Because of Father's absence, the court made its CINC adjudication after hearing an evidentiary proffer provided by the State. Mother did not contest that the children were CINC. The court ordered a reintegration plan for Mother but did not order one for Father given his lack of participation in the case and his continued absence. The court noted that if Father decided to participate in the case a formal reintegration plan could be ordered: "I certainly am not going to offer the fathers—any father a reintegration plan. They have to come to court to ask for one." And because Father lived out of state and did not maintain contact with either the court or DCF, the court relieved Father's appointed counsel from his representation. The court clarified that counsel would be reappointed upon a permanency or termination hearing.

In August 2019, nine months after C.H. and her siblings were adjudicated CINC and fifteen months after the children were placed in DCF custody, the State filed a motion for termination of the parental rights of Mother and all four of the fathers of her

3

children. The court sent Father notice, but he failed to appear for the trial. Father's counsel informed the court that Father had not contacted him in months. Because of Father's absence, the State proceeded by proffering the evidence supporting its motion. It proceeded in like manner for two other absent fathers. Father's counsel did not object to the State's proffer. The State's short proffer noted:

"As to [C.H.], her father is [Father]. That's a named father. Paternity is not established. [Father] was served at the Ross Correctional Institution on November 12, 2019, and the warden was also served. We also published in Unknown Fathers. That was published on December 21st and December 28th of 2019. We were not provided any other names except [Father's]; so there was nothing additional that we could do to try and find the father of [C.H.]. And no one has come forward since that time as a possible father.

"And [Father's] never been present. The Court ordered genetic testing for him. He wasn't always incarcerated. And DCF scheduled four appointments in his home state, and he failed to submit. He was initially served—he actually did come to court once, July 9th, 2019. His name does not appear on the [birth] certificate, and he's not taken any steps to establish his paternity. He's not responded to any correspondence from KVC or sought to establish case plan tasks. And he has not had a visit or communication that KVC was aware of with [C.H.] since the case was filed. And he was not the primary caregiver in the years leading up to removal."

. . . .

"[T]his case has been going on a long time. All these fathers have been basically uninvolved the entire time. We would ask the Court to find all three of them unfit pursuant to K.S.A. [2020 Supp.] 38-2269(b)(7), (b)(8), (c)(2). And as to [C.H.'s] unknown father, subsection (d).

"Due to the pattern and history of behavior that they've demonstrated throughout this case, we ask the Court to find that it is unlikely to change in the immediate or foreseeable future and that we would ask the Court to find that—due to these children's

4

young ages and the fact that they have adoption permanency options available—that it's in their best interest to have the father's rights terminated."

The district court found that although paternity was not established, Father was the only named father of C.H. It then made factual findings which largely summarized the State's proffer, including:

- Father was the only named father of C.H. but he had only presented himself in court as her father on one occasion during the case—in July 2019, about seven months before the termination hearing.
- Paternity was not established, and Father made no efforts to do so.
- Father's name is not on C.H.'s birth certificate.
- Father failed to submit to genetic testing despite efforts to get him to do so.
- Father was personally served while in prison.
- Father did not identify himself as a placement option for C.H.
- Father had no visits with C.H. throughout the case.
- Father has never served as a primary caregiver to C.H.

The court then found that clear and convincing evidence demonstrated that Father was unfit under K.S.A. 2020 Supp. 38-2269(b)(7), (b)(8), and (c)(2). The court noted the efforts made by DCF and KVC to contact and involve Father in the case and Father's lack of effort in seeking to meet the needs of C.H., establish a case plan, or to maintain any visitation, contact, or communication with his daughter. The court also found that Father's unfitness was unlikely to change in the immediate or foreseeable future based on his continued failure to involve himself in the case. Finally, the court determined that based on C.H.'s young age, the permanency options available to her, and the fact that Father had never served as her primary caregiver, that termination of Father's rights was in C.H.'s best interests.

5

After terminating Father's parental rights in accordance with the State's proffer, the court proceeded with trial and terminated Mother's rights to C.H. and her siblings. Because Father was not present when the court made its rulings, the court mailed notice of its decision to him.

Father appeals.

ANALYSIS

DID THE DISTRICT COURT ERR WHEN IT FOUND FATHER UNFIT AND CONCLUDED HIS UNFITNESS WAS UNLIKELY TO CHANGE IN THE FORESEEABLE FUTURE?

Father contends the State failed to meet its burden of proof because its proffer was insufficient to support the court's findings that he was unfit and that his unfitness was unlikely to change in the foreseeable future.

A parent has a constitutionally protected liberty interest in the relationship with their child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Given the tantamount importance and unique character of that relationship, it has been deemed "perhaps the oldest of the fundamental liberty interests recognized." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). Because of the fundamental nature of that right, the State may only extinguish the legal bonds between a parent and child upon clear and convincing proof of parental unfitness. K.S.A. 2020 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

CINC actions, brought under the Revised Kansas Code for Care of Children, K.S.A. 2020 Supp. 38-2201 et seq., stem from the State's interest in protecting the safety and welfare of children within its jurisdiction. See K.S.A. 2020 Supp. 38-2201(a) (proceedings under the Code "deemed to be pursuant to the parental power of the state");

6

and K.S.A. 2020 Supp. 38-2201(b)(1) ("safety and welfare of a child to be paramount in all proceedings under the code").

Once a child has been adjudicated as a CINC, a court may then terminate parental rights if the State proves three elements by clear and convincing evidence: (1) the parent is unfit; (2) the conduct or condition which renders the parent unfit is unlikely to change in the foreseeable future; and (3) termination of parental rights is in the best interests of the child. K.S.A. 2020 Supp. 38-2269(a), (g). The statute lists nonexclusive factors the district court shall consider in making its determination of fitness. K.S.A. 2020 Supp. 38-2269(b)(1)-(9), (c)(1)-(4). These factors may amount to unfitness singularly or in combination, and any one of the factors may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 2020 Supp. 38-2269(f).

In reviewing a district court's determination in termination cases, appellate courts consider whether the evidence presented by the State could have convinced a rational fact-finder that the facts found by the district court were highly probable, i.e., whether the evidence was clear and convincing. See *In re Adoption of Baby Girl P.*, 291 Kan. 424, 430-31, 242 P.3d 1168 (2010); *In re B.D.-Y.*, 286 Kan. at 705. Clear and convincing evidence is evidence sufficient to establish "that the truth of the facts asserted is highly probable." 286 Kan. at 697. It is "'an intermediate standard of proof between a preponderance of the evidence and beyond a reasonable doubt.'" *In re Adoption of C.L.*, 308 Kan. 1268, 1278, 427 P.3d 951 (2018). This court reviews the evidence in the light most favorable to the State and will not reweigh conflicting evidence or reassess the credibility of witnesses. *In re B.D.-Y.*, 286 Kan. at 705.

a.  *Clear and convincing evidence supports the court's findings that Father was unfit.*

As noted above, K.S.A. 2020 Supp. 38-2269 lists several nonexclusive circumstances that can render a parent unfit. The existence of any single factor may establish unfitness if proven by clear and convincing evidence. K.S.A. 2020 Supp. 38-2269(b)-(c), (f). The district court relied on three of these factors in arriving at its conclusion that Father was unfit:

- K.S.A. 2020 Supp. 38-2269(b)(7): "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family";
- K.S.A. 2020 Supp. 38-2269(b)(8): "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child"; and
- K.S.A. 2020 Supp. 38-2269(c)(2): "failure to maintain regular visitation, contact or communication with the child or with the custodian of the child."

Here, other than his appearance at a single hearing, Father did not participate during any stage of C.H.'s case—including the hearing on the State's motion to terminate his parental rights from which he is now appealing. Under such circumstances, K.S.A. 2020 Supp. 38-2248(f) provides that an evidentiary hearing on a termination of parental rights "may proceed by proffer as to parties not present, unless they appear by counsel and have instructed counsel to object." *In re K.H.*, 56 Kan. App. 2d 1135, 1140-41, 444 P.3d 354 (2019) ("[W]hen a parent fails to appear at the hearing on a motion to terminate parental rights, the State may proceed by proffering the evidence supporting the motion if there is no objection by counsel for the parent."). Because Father did not appear at the termination hearing and did not instruct his court appointed counsel to object, the court followed the appropriate statutory procedure in permitting the State to proceed by proffer.

We move forward to the next level of inquiry and assess whether the proffer constituted clear and convincing evidence of Father's unfitness. While Father correctly points out that the proffer provisions of K.S.A. 2020 Supp. 38-2248(f) do not lessen the State's burden of proof, his argument fails to address the substance of the evidence the State presented. As for the efforts made by KVC and DCF, the State highlighted Father's failure to submit to four separate home visits scheduled in Ohio and the lack of any genetic testing despite efforts by the agencies to encourage him to do so. Father received sufficient notification about the case and attempts to procure his participation were made to no avail. K.S.A. 2020 Supp. 38-2269(b)(7) does not require proof of a "herculean effort," only that the agencies made a reasonable effort. *In re A.Z.*, No. 119,217, 2019 WL 638271, at *7 (Kan. App. 2019) (unpublished opinion). In light of Father's failure to engage in the case despite repeated efforts on the part of KVC and DCF to involve him, it cannot be said that the agencies did not expend reasonable efforts to rehabilitate the family or to procure Father's involvement.

Turning to Father's lack of effort to adjust his circumstances or conditions to meet C.H.'s needs, Father was served by mail many times and even made an appearance in court but never attempted to communicate with KVC. Although it appears Father was incarcerated for some period, he did not make any efforts to avail himself when he was not. In other words, Father was aware of the proceedings and the opportunities to work towards rehabilitation but never attempted to establish a case plan or otherwise take any of steps towards meeting C.H.'s needs. Father asserts that the critical inquiry under K.S.A. 2020 Supp. 38-2269(b)(8) should have focused on why he was unable to adjust his conduct or circumstances. But while answers to such questions may have been beneficial for the court in making its ruling, the State's proffer was sufficient to show that he failed to do so.

Finally, on top of Father's lack of communication with KVC and the court, the State noted that he had scheduled no visits with C.H. during the case and maintained no

9

communication with his daughter. Moreover, even before C.H. had been adjudicated as CINC, Father never served as a primary caregiver. Father's lack of visits or contact with C.H. in the nearly 21 months between the time she entered into DCF custody to the termination hearing, support the court's finding under K.S.A. 2020 Supp. 38-2269(c)(2).

Although the State's proffer was brief, it contained sufficient bases for the court to find Father unfit. Unlike the termination ruling in *In re K.H.*, 56 Kan. App. 2d at 1141-42, where the district court terminated a mother's parental rights via default judgment, in the present case Father's rights were terminated by an evidentiary proffer that supported the court's findings of his unfitness. We have no trouble concluding that clear and convincing evidence supports the district court's findings of unfitness because a rational fact-finder could find it highly probable that Father was unfit to parent based on the State's proffer.

> b.      *Clear and convincing evidence supports the court's conclusion that Father's unfitness was unlikely to change in the foreseeable future.*

After arriving at a finding of unfitness, a district court must next ascertain whether a parent's unfitness is likely to change in the foreseeable future. This finding must also be supported by clear and convincing evidence. K.S.A. 2020 Supp. 38-2269(a). Because children and adults have different perceptions of time, the foreseeable future is examined from the perspective of a child. *In re K.L.B.*, 56 Kan. App. 2d 429, 446-47, 431 P.3d 883 (2018). A child has the right to permanency within a time frame that is reasonable to them. *In re M.H.*, 50 Kan. App. 2d 1162, 1170-71, 337 P.3d 711 (2014). It is permissible for a district court to consider the parent's past conduct as an indicator of the parent's future behavior. *In re K.L.B.*, 56 Kan. App. 2d at 447. As with the preceding issue, this court examines the evidence in a light most favorable to the State. 56 Kan. App. 2d at 445.

10

Here, although the record is somewhat limited with respect to Father due to his lack of involvement in the case, it is nevertheless sufficient to support the district court's conclusion that Father's unfitness was unlikely to change in the foreseeable future. In making this determination, the court relied almost entirely on Father's absence in the nearly two years the case was pending and his failure to involve himself with the case during that time. Considering C.H. was 5 years old at the time of trial, Father's prolonged period of absence throughout the case properly yields a finding that his circumstances were unlikely to change in the foreseeable future. Moreover, based on the State's proffer, the district court could find it highly probable that Father's condition was unlikely to change in the foreseeable future considering he showed no indication of any willingness to meet the needs of C.H., let alone make any attempt to contact or visit her. Father only appeared in court for a single hearing during the entire case, he exerted no effort to officially establish his paternity, and made no progress towards rehabilitation or reintegration with C.H. Father's pattern of behavior and his lack of involvement constitutes clear and convincing evidence supporting the district court's finding that his unfitness was unlikely to change in the foreseeable future.

## DID THE COURT ABUSE ITS DISCRETION IN DETERMINING TERMINATION OF FATHER'S RIGHTS WAS IN C.H.'S BEST INTERESTS?

After finding a parent unfit, a district court must determine whether termination of parental rights is "in the best interests of the child." K.S.A. 2020 Supp. 38-2269(g)(1). This assessment gives "primary consideration to the physical, mental and emotional health of the child" and involves weighing termination against the parent's continued presence. K.S.A. 2020 Supp. 38-2269(g)(1); *In re K.R.*, 43 Kan. App. 2d 891, Syl. ¶ 7, 233 P.3d 746 (2010). Because determining what is in a child's best interests is based only on a preponderance of evidence and is inherently a judgment call, this court will only overturn a district court's best-interests determination when it constitutes an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2. A district court exceeds the broad

11

latitude it is afforded if no reasonable person could agree with its decision or if its conclusion turned on a factual or legal error. See 50 Kan. App. 2d at 1118.

On appeal, Father argues the court's decision was arbitrary because "there is nothing in the proffered evidence concerning the best interest of C.H. other than that she is young and has adoption possibilities." The State counters that the court properly arrived at its conclusion following consideration of C.H.'s young age, the amount of time she spent in DCF's custody, the lack of contact or visitation with Father, and Father's failure to work towards reintegration.

After finding Father was unfit and that his unfitness was unlikely to change in the foreseeable future, the district court terminated Father's rights based on the State's proffer and the guardian ad litem's statement that it was in C.H.'s best interests that Father's parental rights be terminated. The court explained that given the fact the case involved children of tender years and that suitable permanency options were currently available to them, that C.H.'s best interests required termination of Father's rights. Despite Father's concerns about the bases for the court's ruling, the two factors he focuses on addressed core considerations a district court must make when tasked with the difficult decision of whether to terminate a parent's rights:  (1) the physical, mental, and emotional needs of the child and (2) the nature and strength of the parent-child relationship versus the child's need for permanency. See *In re K.R.*, 43 Kan. App. 2d at 904. The court's explanation of its ruling contemplated both C.H.'s young age—which when viewed in context of its prior findings of Father's unfitness encompasses both the amount of time since she was removed from Mother's home and the time Father had been physically and emotionally absent from her life—and the need for her to have some permanency—a tangible possibility due to the availability of permanency options. Father contends "[t]here is no evidence that would have allowed the court to determine whether C.H. would have been better off without her father in her life." This argument lacks any appreciable measure of force given that Father never availed himself of the opportunity to fulfill a parental role in

12

C.H.'s life. There is no evidence of any parental bonding between Father and C.H. Considering his lack of involvement in either this case or C.H.'s life, it was not unreasonable for the court to conclude that Father could not provide for C.H.'s physical mental, and emotional needs and that her interests were better served by termination. Moreover, after the nearly two-year pendency of the case, it was not unreasonable for the court to find that C.H. needed permanence and should no longer have to wait for Father.

Although the district court's explanation of its decision to terminate Father's parental rights was rather brief, it cannot be classified as either an error of fact or law. It likewise cannot be said that no reasonable person would agree that termination was in the best interests of C.H. The decision of the district court is affirmed.

Affirmed.